10-33-08 James Cuthbert v. Soy Capital Bank If the Council could approach the SAGI bench. Tell us who you are and who you represent. Good morning, Your Honor. My name is Richard Lang and I'm with Don Taylor of Carpellian Crew here and we represent the plaintiffs. Your Honor, I'm Adam Oyebanji and I'm with Andrew Neeland for Barrack Farasano and we represent the defendant. Okay. Very good. You were probably here watching the first arguments, but we typically go 15 minutes per side. If you want some time for rebuttal, please try to save it for yourself and we'll let you know if you're running short. So go ahead. We'll proceed. Thank you. Also, these microphones are for recording. They don't amplify, so keep your voice up. May it please the Court. My name is Richard Lang again and along with the Co-Counsel, we represent 13 of 47 clients of the defendant, Soy Bank, whose IRA accounts were embezzled by a gentleman named Bill Huber. The Soy Bank issued quarterly account statements until September 2009, and in these account statements, Soy Bank reported that the accounts were increasing in value and at the end totaled $3,350,000. The next statement, the September statement, discloses that the accounts were worthless. The issue in this case, in our view, is extremely simple, and that is whether Soy Bank undertook any fiduciary duties in reporting on these quarterly statements to their clients. The Soy Bank has taken the position that they have no such fiduciary duties, and they rely almost exclusively on the form IRA agreement in saying that they're custodial self-directed accounts. And the lower court dismissed this case on a 2-6-15 motion, essentially finding there were no fiduciary duties, although there's no written opinion. You know, let me just write off, you know, I've read all of these, and I kept looking for a duty. I find no duty anywhere in any of these. You keep saying fiduciary, fiduciary, but fiduciary is not defined by you specifically as to any clear point where an obligation occurs. And I only say this because I'm bound by similar obligations. When I deal in stocks, and I don't see any obligation on the part of the bank. Well, that's my job, then, to persuade you. I know. I'm just saying. The harmless agreement is so well written, you're. Right. Well, what we believe that that ignores are the supplemental agreements that were entered into by the clients in the bank. These supplemental agreements are defined, and they say they give additional terms, additional provisions to the standard agreement. And under these additional provisions, the bank is paid a fee of .25 percent, which in the case where we have records, Mr. Tucker's case, is $1,000 a year to provide fiduciary services. One of those services is to provide a quarterly asset and transaction statement on that. That's merely producing a copy of whatever was given to them. No, it's not that at all. It says absolutely nowhere in these statements that they are parroting what Mr. Huber said. As a matter of fact, each of these statements is on Soybank letterhead. Even though they bought a fund, they indicate a specific dollar amount, and they indicate over time how that dollar amount has changed. There's nothing that would lead any of these plaintiffs to believe that Soybank has not made an inquiry for their fiduciary fee. But where in the documents does it say they have to inquire? They say that these fiduciary fees will provide a high level of fiduciary services to them, and that's how they justify the fiduciary fees. You're still coming back to the word fiduciary. Yeah. And I'm not buying it. That can mean anything. Well, fiduciary. For $1,000, that's nothing. Well, $50,000, well, $47,000 if all the people paid the same amount of money. That's a great deal amount of money to sit there and parrot something back to people. And the people in this case certainly believed and relied on the fact that this is Soybank's transactions. And two of the people went to bank officers and questioned them and were told, well, we have audited the accounts, and your money is fine on that. Excuse me. There's some document that actually refers to auditing, Soybank's auditing these accounts. Is that correct? There is an affidavit. Besides the affidavits, I thought that there were documents that Soybank drafted, obviously, that talked about verifying the accounts. Well, it doesn't use the term audited the accounts. They do say that in their account documents that they evaluate transactions to ensure the transaction is in compliance with the bank's fiduciary obligation and applicable state and federal regulations. Drop the word fiduciary from your arguments and start giving me something substantive. You're hanging everything on the word fiduciary, and I'm saying I read through your briefs. If I take the word fiduciary out, I don't think you have a basis. Because you don't define a specific act or a duty anywhere in here. The duties are, well.  Give me a duty. The duty is to report. And if you report, you have to use reasonable care in reporting. What reasonable care is, we're at a 2-6-15 stage. I suppose somebody could say reasonable care doesn't include checking, but I don't believe that that's the case. What are they to check? What? What are they to check? Well, they said they audited the accounts. That would be very, very good. We don't know. They didn't apparently do anything. But if they used reasonable care, they would have at least looked. And they had warning that Huber was unreliable or up to something. They told one of the clients they were thinking of getting rid of the Huber funds, and they're going to have to get rid of all these people so as not to draw attention to it. They had warning. Okay. Mr. Huber was the subject of a rather large fine from the Secretary of State in 2005. Is that correct? Yes, he was. And are you saying that Soybank had a duty to know that? Well, no, I'm not really saying that. Are you saying that Soybank had a duty to tell the plaintiffs? Soybank had a duty to tell the plaintiffs what they knew about Huber. We don't know what their cause for alarm is. We only know they had a cause for alarm. We'd have to find that out and discover it. Do you think that the plaintiffs themselves had some duty to find out about Huber's fine from the Secretary of State? No. As prudent investors? No, I don't think that they had a duty to further inquire. And we believe that Soy's duty arose from the fact that they had information, although we don't know exactly what it was. What do your clients think Soy was getting this extra money, this extra $1,000 for? What did your clients believe they were getting for that $1,000? To look after their accounts. And? And that would include that the quarterly statements were accurate, that they said that Huber was one of their family of investment people, that they had a relationship with him, and you would have a duty to inquire, a reasonable duty to inquire. Okay, but didn't all the releases include language that said from Soy Bank, we, Soy Bank, we're not fixing any numbers here. We're just getting them from you, the investors, and from Huber. Oh, absolutely not. These aren't our numbers. Absolutely not. There is no indication anywhere in here that they have acquired information from Huber. It's stated in their briefs, but we don't know that. It's not in any documents? It's not in any document that these figures come from Huber. And the only thing in the IRA form is that the clients promised to give accurate information in opening the accounts, and there's no indication that they didn't do so. So Soy tells these people, we're charging you to do something additional, to look after your accounts. They didn't do anything. The extent of that duty, we would say, well, it's, you know, we should go on and complete discovery and find out what it was, but it is a reasonable duty. It is a reasonable duty to inquire. Were these audited accounts? No, they weren't. Was there a duty to audit them? There wasn't. If they said they had audited them, I think that would raise a duty to audit them. They had told at least some investors they had audited them. We would not say, had they just said we were providing quarterly accounts, their duty would be to be reasonable, to be reasonably accurate. If you get a statement from your bank that says you have not so many shares of some stock, but this specific dollar amount in it, and it's grown, you would have a reasonable duty to have some basis for that figure. These are securities that we're talking about in the IRA. Physically, where was the paper of those securities? I don't know. We've never gotten to there. And because one of the accounts is a bailment account, of course, and everybody agrees this is a bailment, you have a duty to safeguard that property which you give them because they're not ordinary deposits. And that would be an interesting question to see, where were the certificates? Where was the funds that are being traded? I don't know the answer. How do you get around the release? Excuse me, Justice. How do you get around the release? What release? I don't believe there is a release. The hold harmless that he's talking about. I release and agree to hold the IRA custodian harmless against any and all claims or losses arising from my actions, which? That's in the account opening statement, and these claim holders took no actions, and they provided no false information in connection with opening the account. But they directed where the investments were to go. They directed that their direction was that the bank purchase a security, and it's called the quarter fund, and that they invest in this quarter fund. That was their direction. Now, how that's carried out, we don't have any information in. But they did not appoint Bill Huber, the agent, to give the information to the bank that the bank is then going to tend to them. They didn't. He was not their agent for that purpose. So they were counting on the bank to decide, you know, is this a good investment or should I go into another investment or give them investment advice? Absolutely not. I wouldn't want to confuse that. The bank had no responsibility for Huber stealing the money. That's not what we're saying. What they had a responsibility for is being asleep at the switch and not doing anything to detect, is this, how's your account doing? And, in fact, affirmatively misleading some people, it's doing just fine. So I reported to the IRS the funds at $1.3.5 million cumulatively? Well, I don't know that, Justice Pachinksi, because under the Standard I Agreement their only obligation was to issue an annual report. That report had to go to the IRS. And did that have incorrect information in it? We don't have an annual report. Instead, they separately charged a fee for quarterly reports. That's what we have. We have the quarterly reports. I don't know that those went to the IRS, but these quarterly reports show the dollar value of, this is just Mr. Tucker, but Mr. Tucker's account. So they did have the obligation under the Standard Agreement. They have an additional obligation for the quarterly reports under the Supplemental Agreement. And is there a disclaimer on the quarterly reports? No, there's no disclaimer. And is there a generic disclaimer about quarterly reports someplace else? No. I'll reserve the rest of my time. Thank you. May it please the Court, with all due respect to the excellent argument of my friend Mr. Lange, plaintiffs in this case have no legal basis for this appeal whatsoever. And I say that because the contractors issue here, the IRA agreement, is very clear about the duties that the bank owes to the plaintiff. This is, simply put, a self-directed IRA account. The obligation under the agreement is that the bank will open an account for tax purposes. The only reason that the bank is involved in this transaction at all is that's the only way you get the tax benefit of an IRA. And the bank will invest the money as directed by the plaintiffs. The plaintiffs directed the bank to invest the money with Huberdex. That is what the bank did. Huberdex turned out to be a fraudulent enterprise. That's not the fault of the bank. And that is the loss, unfortunately, of the plaintiffs. Where does the connection that counsel raised between the bank and the entity that they end up buying or purchasing the documents? The connection between the bank and that entity? Yeah, he's saying that there's a close connection, therefore, and that maybe the plaintiff is being, I don't know what he's referring to. I have difficulty answering that question because I just don't think the basis for it exists in the papers. He's saying it was like an in-house deal. Right. If we get an account, bank, we'll give it to you, you know, we'll tell them to go to you. That isn't pleaded. What's pleaded is that there's a pre-existing relationship between plaintiffs and Mr. Huber. Mr. Huber says, if you want to invest directly with me, and I'm taking this from the pleadings, I'm not inventing this. Mr. Huber says, if you want to invest directly with me, you can. If you want to invest and get the tax benefits of an IRA, you can go to Soybank, which is a local bank in the Decatur area, and you can direct that bank to invest with me. And that's what the plaintiffs in this case did. There is no basis. So you're saying the direct connection is between the plaintiff and the entity that's buying or selling the stuff. Yes. But it's that the bank, in effect, is just an accountant, in effect, for the IRS purposes at the end of the year is really what they come down to be. Your Honor, yes. And can I make this point? If one reads Mr. Leng's pleadings, there is no allegation of additional agreements. You will not find that in the complaint. If you go all the way to count five and you look at the complaint, what you will see is an allegation that there was a breach of a single agreement. And that's the allegation in the papers. And that's the allegation essentially before the court below, that there are some extraneous documents, and we don't, for these purposes, given the posture of the case, we make no point that they're extraneous. They are exhibited to the complaint as part of the contract. But it's one contract. There are no extra fees in this case. You will not find pleaded anywhere in the complaint extra fees. And we need to be comparatively clear about this. You will know, because it's been discussed already, that Mr. Tucker's fee was $1,000 per annum on $400,000 of at least theoretical investment. That's the basic fee, 0.25. 0.25% per year. And if you look at, I think it's SOY 13, what you'll see there is a document that's simply entitled Self-Directed IRA and Roth Accounts. And in there, there's a list of basic services, including, admittedly, provide a quarterly asset and transaction statement for 0.25. All the services in this case were for 0.25%. The idea that there are additional fees hiding in this case is a fantasy. You will not find it pleaded anywhere, and you will not find it in the documents that are exhibited to the complaint. In fact, if you look at SOY 68, which is part of what's called an annual disclosure form, you will have heard Mr. Lange use this language, I think, in response to, I believe it was Justice Buczynski's question. Well, where do we find these additional fiduciary duties to evaluate either the account or the investment house? And I think he quoted language in compliance with the bank's fiduciary obligation and applicable state and federal regulations. That comes from SOY 0068. And if you read SOY 0068, it's simply a disclosure about the bank's involvement with money market and mutual funds. And this particular language that was quoted is as follows. Broker-dealer. Soy Capital Bank and Trust Company has a business relationship with Raymond James Financial Services, an entity that has nothing to do with this case. A broker-dealer, which is used by the trust department, there's the word trust, from time to time to execute securities trades. The same factors used to evaluate transactions with unrelated broker-dealers are considered when placing orders through RJFS to ensure the transaction is in compliance with the bank's fiduciary obligation and applicable state and federal regulations. There is no reasonable way in our submission to read that paragraph as importing the duty with regard to a self-directed IRA to audit or investigate or verify numbers that were provided to the bank by the plaintiff. And I say by the plaintiff because Huberdex is the plaintiff's agent. Plaintiffs signed this agreement. One presumes that they had legal advice when they did so. But the agreement is pretty clear about this. In the event, I'm quoting now from page 4 of our briefing at the very top, in the event you, plaintiff, appoint a third party, i.e. not the bank, or have a third party appointed on your behalf to handle certain transactions affecting your IRA, and this is a case where the plaintiffs expressly instruct the bank to give the money to Huberdex for Huberdex to manage. So, clearly, that definition of a third party applies to Huberdex. And the language goes on, such third party will be considered your agent and therefore you for the purposes of this agreement. So, it's just not correct to say that there is some magical hidden agreement with respect to which discovery is required. That is not how the plaintiffs pleaded their case. They pleaded a single agreement. The documents that they append showing that single agreement, and I draw no distinction between the additional documents that the plaintiff seeks to rely on and the standard IRA agreement. We are happy for the purposes of this case at this time to deal with it all as one agreement. There's simply nothing in those documents to justify what they're saying. This is a self-directed IRA for 0.25%, and for that 0.25%, you get the bank's name on the account, which gives the plaintiffs the tax benefit of the transaction, and the bank takes the plaintiffs' own information from Huberdex and uses that for quarterly statements, and the bank expressly says and informs the plaintiffs, look, you have to understand that we are going to rely on information provided by your agent, that we don't have a duty to investigate, and that in any event, if something goes wrong and there are losses, you agree that you'll hold us harmless. There's simply no way that this agreement allows the existence of the duties that the plaintiffs are simply inventing for the purposes of this litigation. And it doesn't matter whether you say this is a fiduciary obligation, though I agree with Justice Smith that there's nothing to hang a fiduciary obligation on other than the word fiduciary appearing on one document at one time. It doesn't actually matter if it's a fiduciary obligation, or if it's a trust obligation, or if it's a bailment, because all of those duties under Illinois law are governed by the contract. They're governed by the written instrument. So even if you were to say there is a fiduciary obligation here, in answer to Justice Smith's question, well, what is it? All you can say is, and I rely on First Midwest Joliet Bank for this proposition, all you can say is the fiduciary obligation, if it exists, is coextensive with the contract between the parties. And the contract between the parties simply doesn't contain the duties that the plaintiffs wish that it contained. There's simply no way around. Nor, in our submission, is that particularly unfair. The SOI was charging based on the market value of the account. And they just took it on Uber's word that this was the market value. What if they thought that they were being cheated? Would they have wanted to check into it? Well, I can only speculate as to that. I don't know, is the short answer. What I do know is what the bank said it would do. And what the bank said it would do expressly was it would rely on information provided by the plaintiff's own agent. And the bank did not say that it was going to audit the accounts? The bank did not say that. Or verify them. No. You will not find a syllable in all the pages that are appended to the complaint that say anything like that. And consider this for a moment. What power does a bank have to audit another corporation's account? It's not the SEC. It's not the Attorney General of Illinois. It can't just go up to an investment company and say, we're SOI Bank. We are going to audit your accounts. That's simply not realistic. Even if it were, consider what it would involve. Here you have three mutual funds which claim they're investing in a variety of securities. So it's not enough to simply go in and say, can I look at QBDX's books? You then have to verify that what's in the books is accurate. That is an enormous task. And if the plaintiff is right, then there are millions upon millions of self-directed IRA accounts that every bank, and it may be that there are people in this room that have them, that every bank would suddenly be required to do in-depth investigation, not simply of the investment company but the investments that the companies purport to hold. And maybe there are further investments beyond that. For 0.25 percent, that's simply unreasonable. Well, did SOIA at least undertake to do the custody and safekeeping of the securities? Your Honor, we would say no. And insofar, it's hard to understand how. Some people on self-directed don't give the bank the securities. Right. I mean, that's, that's, it can be either way. Or it could be half and half. It could be. So there's no real direct obligation or commitment unless the individual directs it and gives it to them. Your Honor, that's correct. I'm hesitant to answer, in giving an answer, because, of course, we're confined within the four corners of the pleadings, given that this was a motion to dismiss. But what I would say in response to Your Honor's question is this. It doesn't really matter. It doesn't matter because the, what the bank agreed to do was invest the money with Hubert Davis. It's not suggested for a moment that the bank didn't do that. Right. I suppose you could argue, as the plaintiffs have sought to argue, that there is some kind of trust relationship, that the bank is the legal owner of the security and is therefore a trustee for the benefit of the plaintiffs. But that would only be to invest it where the plaintiff directed it. Your Honor, yes. And, again, there are a couple of problems which we've dealt with in our brief. First is you actually have to intend to create a trust. And there's no factual basis pleaded. And this is not the federal court, thankfully. There's no factual basis pleaded on which one can say, well, yes, it's plausible that there was an intent to create a trust. That isn't pleaded. Even if I'm wrong about that, you once again come crashing into the contract because the trust is controlled by the trust instrument. And the trust instrument in this case is the contract. And the contract simply doesn't give those duties. So that's a rather long-winded answer to the question. But at the end of the day, we say it just doesn't matter who held the security. So the plaintiffs are in a self-directed IRA, and they hand over money to SOI with the direction to buy shares, let's call them, of Ubidex's different accounts. And the bank did that. And the bank was, according to you, under no obligation to figure out that these shares were worthless. Does that sum it up? That's entirely right. The bank said expressly it's not giving investment advice. Mr. Leng, I think, quite properly makes that concession, that it's not our job to give investment advice. We were told to invest this money with Ubidex. That's what we did. That was the extent of our duty. And because we did that, the plaintiffs got a significant tax benefit thanks to the IRA legislation. A sort of pyrrhic benefit since there was no actual money. Yes. But that goes to the behavior of Bill Hube and Ubidex, entities that the plaintiffs chose to invest with. The bank kept up its end of the bargain. It provided the tax benefit, and it sent the money where it was told to send the money to. Can I make, I know I'm running out of time, can I make two other short points? The first point is this. It's a matter that hasn't been touched on in oral argument today. But one of the arguments that has been put forward by the bank is that, in any event, this is a matter for the federal courts, that this is a covered securities class action. That is an argument we've made in our briefing. There was a reply to that point that Mr. Leng made at page 19, I think it is, of his brief. And his argument is simply this. This class cannot consist of more than 47 people because that's the number of investors. And there's no dispute between the parties about that. That number is accurate. And what he says is that you have to have more than 50 people for this to be a covered class action for the purposes of the federal securities legislation. And he cites, quite properly, 15 U.S.C., section 77P, F2A, little Roman numerals 2. I hope the court will forgive me if I don't go back through that alphanumeric soup again. But that section, subsection, does indeed define a class as being of more than 50 people. The problem is the federal legislation contains three alternative definitions of a covered class action. A covered class action can be A or B or C. And the definition that Mr. Leng and plaintiffs relies on is C. The word immediately before the definition that Mr. Leng relies on is or, O-R, not A-W-E. And the subsection immediately before, which is part of sub, sub, sub, sub, subsection little Roman numeral 1, is this, that a covered class action means one or more names parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated. Well, one only has to look at the caption of this case in this court to see that this is a class action covered by the federal securities litigation. The caption gives certain names and after the last name plaintiff, Ms. Reed, it says on behalf of themselves as individuals and as representatives of the class of all other persons similarly situated. So, even if, even if the bank is completely wrong about everything else, this is still not a case that belongs in the state court system and it should go before the Northern District. And the final matter I make is simply a broad one, which is this. Soybank is a bank. It is not an insurance company. What the plaintiffs are seeking to do in this case is to avoid the consequences of their own investment decisions. Soybank is not in the job of providing insurance to investors to protect them against the trials and tribulations of a free market in which some of the players are less than honest. If, if the plaintiffs, if the plaintiffs wanted to get insurance, then they should have gone to an insurance company and asked for it. And one imagines that they would have been charged considerably more than 0.25 of 1%. If it pleases the court, we have nothing further to say. Counsel, I didn't get your name. Oyee Banjee. Okay. If you say all the vowels, Your Honor, you'll be there. The usual spelling. Yes. Okay. And pronunciation. Absolutely. Thank you. Yeah, you were the hidden one. You weren't on the elevator. I was very quiet. I was very quiet. Mr. Lane. Yes, Your Honors. No particular order. It is important that this is a trust and it is a trust under both the Massey case and the case actually cited by Mr. Oyee Banjee because that brings in the Trust and Trustees Act. And under Section 5.1, a trustee may not delegate his duties of reasonable inquiry into transactions. You can't do it. And it goes back, Justice Smith, I believe they'd have the duty to act reasonably in any way. They didn't just open an IRR account. They additionally said, we're going to give you quarterly reports and refer to them. But are they a brokerage firm? It's who a brokerage firm? Hubedeck's? The bank? No, they're not a brokerage firm that I know of. No, I just, I'm trying to clarify something that you raised in my mind and he raised too and I should have asked both of you, but I'm just trying to distinguish something there. No, their letterhead, all I know it says, Soy Capital Bank and Trust Company. These investments are handled under the Trust Company side of it, and they indicate these are trust fees that they're charging, et cetera. And the case law is very clear that they are trust and they have an obligation under the Trust and Trustees Act. If it's a trust, to go back again to the release, how do you get past the release in the Genoa Act case? That was my case. That was your case? Yes, it was. I was the plaintiff in that case. There isn't any release in the general terms here. What the language Mr. Obanji referred to was that if you appoint somebody to handle certain transactions, then they're your agent for the purpose of handling those transactions. We're not suing them because Huber made bad business decisions. They didn't appoint him as agents for issuing quarterly reports. And Soy Bank never indicated that he was issuing quarterly reports. They were issuing the quarterly reports. And those are part, there's not a whole, there's not a number of, you know, different agreements. And we do refer to these additional documents in paragraph 13 of the complaint and other places. These additional terms and conditions included the obligation of Soy Bank that they undertook to issue quarterly reports. And in doing so, they had a duty to do so reasonably. The modest fee, I don't know whether $1,000 is modest, that's not in this standard document. That's in these additional terms and conditions in which they're undertaking these other obligations as part of this $1,000 fee. The close connection, he said, you know, there's no connection. Well, their account statement in which the IRA is open, if you appoint somebody to handle the money, only allows you to appoint Huberdex. That's the only one. It's a specially tailored one. They couldn't say, I want to go get somebody else. It is invest available funds with Huberdex, Inc., and then enlist the available Huberdex funds. That's all you can do. They do have a close relationship with Huberdex. And they say that these funds are invested in one of the Soy Company's financial family. These account holders had a perfect right to suppose that Soy Bank was watching out for them. That's what they charged them for. That's what the account statements say. That's what their other documents are doing. It's not that they're insurers for bad business decisions, but these people, had they been warned, had they had a chance, could have done something about it. But they didn't get warned. They didn't get any chance until they got a statement that says your accounts are worthless. It went from everything is fine to worthless. And that's the only complaint against Soy Bank. I should just briefly cover SLUSA, the Federal Preemption Act. Two things. One, it's not in connection with the purchase or sale of a security. This is in connection with reporting requirements. We're not suing them for making financial decisions. But the other thing is, as far as whether it requires 50 for a covered class, well, I just rely on the Supreme Court that said in Merrill Lynch that a covered class consists of 50 or more people. Are there any other questions? Thank you very much. I do have one question. Yes, Justice. If Justice Lavin has talked about the releases, are you saying that there weren't any releases? There isn't a general release. What he's talking about is they say that the information you give is going to be correct. And this is in connection with opening the agreement. And we're going to define you as your agent, too. And their agent, and they say if you appoint somebody to do something for you, he's your agent for that purpose. Well, Huber's their agent for, you know, trading transactions. We're not trying to hold them responsible for that. But they didn't appoint Huber as their agent for issuing the Soy Bank quarterly reports. What about the hold harmless language? That's the same thing. There isn't a general hold harmless language. Are you somehow suggesting that that's ambiguous? I don't think it's ambiguous at all. I don't think Huber was ever appointed their agent for purposes of issuing these reports. There's no other release. The only other thing that says, in connection with opening this form, you've provided accurate information. And they did. So I don't believe there is a release. All right. Thank you. Thank you. I just wanted to comment. These are two of the best arguments I've heard this year. I really appreciate both your preparation and arguments. Thank you very much. We're adjourned.